Filed 10/30/15  Sanchez v. Superior Court CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| SILVERIO SANCHEZ,<br><br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF<br>HUMBOLDT COUNTY,<br><br>      Respondent;<br><br>THE PEOPLE,<br><br>      Real Party in Interest. | A146118<br><br>(Humboldt County<br>Super. Ct. No. CR1002049) |

Silverio Sanchez, the defendant in the underlying criminal proceedings, petitioned the trial court for a writ of prohibition and a stay of trial court proceedings after the trial court denied his motion under Penal Code section 995 to set aside charges in the information.[1]  We stayed the trial court proceedings, requested briefing, and notified the parties that we could issue a peremptory writ in the first instance.  (See Code Civ. Proc., § 1088; see also *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 180.)  We now grant the petition in part and restrain the Superior Court from proceeding to trial on count 9 of the information (forcible rape in violation of section 261, subdivision (a)(2)).

---

[1] Further undesignated statutory references are to the Penal Code.

The Humboldt County District Attorney filed an information charging petitioner with the following felony offenses:  kidnapping for purpose of rape (§ 209, subd. (b)(1) (count 1)); kidnapping (§ 207, subd. (a) (count 2)); criminal threats (§ 422 (counts 3 and 4)); stalking (§ 646.9, subd. (a) (count 5)); attempted kidnapping [§§ 664 and 207, subd. (a) (count 6)); first degree residential burglary (§ 459 (count 7)); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4) (count 8)); and forcible rape (§ 261, subd. (a) (count 9)).  The information also charged petitioner with misdemeanor unlawful sexual intercourse with a minor where the age difference is no more than three years (§ 261.5, subd. (b) (count 10)).  The information alleges that the offenses were committed between November 1, 2009, and March 24, 2010.

Petitioner's motion under section 995 challenged the sufficiency of the evidence on counts 1, 5, 6, 7, and 9.  The People conceded that count 1 (kidnapping for purpose of rape) should be dismissed, and the trial court dismissed it.  But the court declined to dismiss counts 5 (stalking), 6 (attempted kidnapping), 7 (residential first degree burglary) and 9 (forcible rape), and petitioner then petitioned this court for a writ prohibiting the trial court from proceeding on them.

Evidence presented at the preliminary hearing established that in early November 2009, the victim, Jane Doe,[2] went to the Holiday Inn in Fortuna for an overnight stay with a friend and her friend's family.  In the evening, Doe started receiving calls and texts from petitioner, a person with whom she had a "stormy" relationship and had been "arguing [with] more than before."  After about 10 calls, Doe turned off her phone.  Petitioner then started calling Doe's friend, who at one point answered her phone and

---

[2] Doe was the victim in the offenses charged in counts 1 through 6 and 9 and 10.  She was a minor at the time the offenses occurred.  Doe had known petitioner since she was in second grade and petitioner's uncle is her stepfather.  Doe began an intimate relationship with petitioner when she was 16, and their relationship lasted for about a year over 2009 and 2010.  The victim alleged in count 8 is Doe's stepgrandfather; Doe was living with him and her grandmother at their residence on March 24, 2010, when the alleged first degree burglary charged in count 7 occurred.

handed it to Doe. Petitioner told Doe he just wanted to see her, and he indicated that she could return to the hotel after they met. Doe agreed to see petitioner. About 30 minutes later, petitioner called to say he had arrived at the hotel, and Doe went outside to meet him.

Doe saw petitioner standing beside his car. When she went over to him, petitioner said, "Get in the car now, bitch." Petitioner's comment made Doe uncomfortable and concerned for her safety because petitioner was upset and accused her of "sleeping around" with her friend's brother. Doe replied to the accusation by saying, "I wasn't. I barely hang out with 'em." Doe stated petitioner "was threatening me, but, like, I knew he wouldn't do anything about it." According to Doe, petitioner said, "I'm gonna kill you, or something like that," but she "just felt like he wouldn't hurt [her]." She was "scared but not too much." At one point, petitioner grabbed her arm "lightly" and "kind of pulled [her] to come to the car."

Just outside the Holiday Inn parking lot, petitioner halted at a stop sign, and Doe opened the car door because she was scared and wanted to return to the hotel room to get her phone. As she opened the door, petitioner pulled away, and Doe rolled out of the car onto the road. She suffered a bruised foot and toe in the fall that was "pretty painful." Petitioner got out of the car, asked if Doe "was okay, and he came up and picked [her] up and put [her] back in the car."

Petitioner proceeded on Highway 101 toward Eureka, and at one point said, "Why don't you jump out now, bitch?" Doe was sad and scared, and she was crying. Asked if she took "any action towards" petitioner, Doe said she got on top of him, "punched him in the balls," told him to calm down, and to stop threatening her. Doe told petitioner, "If you want to kill me, I'll kill both of us" and "[t]hat's why I got on top of him while he was driving." Doe's action succeeded because he said, "Okay, I'll stop now," and they kept going toward Eureka.

Petitioner and Doe got out the car at the Flamingo Motel in Eureka. During Doe and petitioner's relationship, Doe stayed with petitioner on the weekends; petitioner lived with his family. The family had no permanent housing and lived at the Flamingo Motel;

3

they had been there only a few weeks after having come from a different motel. Doe had been to the Flamingo before to stay with petitioner on the weekend. The motel accommodation consisted of a living room area, bathroom, and a kitchen beyond the bathroom. Petitioner shared the accommodation with his mother, his brother, and his brother's girlfriend and her children. The others slept in the living room and petitioner slept in the kitchen. When Doe spent the weekend with petitioner, she would stay with him in the kitchen.

Upon arriving at the Flamingo Hotel, Doe said her foot hurt. Petitioner offered to take her to the hospital, but Doe declined. They went into the motel room, and then back to petitioner's area in the kitchen, where he had a video game and a television set. According to Doe, things were "kind of back to . . . normal" between them at this point. She stayed with him that night, but they did not have sex.

Doe "slept in" the following morning, and during the day she and petitioner "just hung out" together, doing what they "normally did." In the evening, Doe said she wanted to go back to her home in Rio Dell or to the Holiday Inn to collect her belongings. Petitioner did not want to take her to the Holiday Inn because he thought she was spending time with her friend's brother there. Doe expected petitioner to take her home since that is where he usually took her after she stayed with him. Petitioner then asked Doe to have sex. Doe said, "I don't want to do that right now." Petitioner became "a little upset" with her and Doe was "just mad 'cause I was hurt already." Doe then said "something along the line of fine, but you're going to have to do all the work, or I'm not getting on top of you." She said that because she "wasn't too pleased with him" about her injured foot and it "might have hurt to do it that way." They then had sex, and petitioner drove her home shortly afterwards.

Less than a week after the events at the Holiday Inn and the Flamingo Motel, Doe decided to go to Arizona where her father lived because she was tired of petitioner's conduct and thought it was a "good way to get away from that whole situation." Doe stayed at her stepfather's house for a day or two until her father arrived from Arizona to collect her. Once she was in Arizona, Doe called petitioner and started talking with him

4

again; he sent her some money so she could get a phone. Doe and petitioner communicated for a couple of weeks and discussed the possibility of Doe returning to Humboldt County and the two of them getting back together. Doe described these conversations as "kinda happy and sad. [¶] . . . [¶] I guess we were both happy to hear from each other, but he . . . was sad I was gone and, like, I was sad that I was gone 'cause I didn't want to leave in the first place" but "wanted to get away from him at the time." Petitioner went to Arizona while Doe was there. Doe did not see him, but family members saw him and spoke to him in person. Doe subsequently returned to Humboldt County. After she returned, but before the evening of March 24, 2010, Doe received several texts and phone calls from petitioner. Most of the time, petitioner sounded "sad and upset" in the phone messages he left.

After Doe returned from Arizona, she resumed living with her stepgrandfather and her grandmother. At one point, her stepgrandfather contacted the police because petitioner was calling on Doe. Petitioner was angry about being reported to the police and "made a threat toward" Doe's grandmother, telling Doe "he could have somebody take care" of her grandmother.

On March 18, 2010, Doe and her grandmother were interviewed by the district attorney's child abuse services team. An undersheriff, William Honsal, was present at that interview, and he met with Doe and her grandmother a few days later at the district attorney's office. The purpose of that meeting was to "go over several messages that were left on the phone" by petitioner. Doe brought the messages to the attention of the district attorney's office because "she was disturbed by the content of the messages, the threatening manner of the messages." Based on Doe's "general demeanor," Honsal's impression was that Doe was "scared" by the five or six messages petitioner had left on her phone. Doe was recalled to testify about the phone messages. She stated she brought the phone to the district attorney's office so the messages on the phone could be recorded. She found some of the messages threatening and felt "scared at the time" she heard them.

This brings us to the events of March 24, 2010. Around 1:00 a.m., Doe heard her dog barking and knew someone was outside. She looked out her bedroom window and

5

saw petitioner looking directly at her. Doe had exchanged texts with petitioner the day before, and she had not invited him over that night. She "got in a little bit of a panic mode" and went to her grandparents' bedroom at the back of the home. Doe woke her stepgrandfather and told him that petitioner was there and not to go outside. Her stepgrandfather went to the front sliding-glass door and opened the curtain. Petitioner was standing there yelling that he wanted Doe to come out and leave with him. Her stepgrandfather opened the door and told petitioner to leave. As her stepgrandfather bent over to open the dog gate so petitioner could exit the front porch, he felt a blow to the back of his head that left him bleeding. Her stepgrandfather got up, went back into the house, and saw petitioner trying to get into Doe's bedroom. Her stepgrandfather pulled petitioner away from the door and shouted to Doe to go back to her grandmother's room and lock the door. Petitioner hit Doe's stepgrandfather in the face with his fist, and her stepgrandfather "went down again" as he saw petitioner "go back towards the back bedroom."

Meanwhile, Doe had reached and entered her grandmother's room but forgot to lock the door behind her. As she stepped toward the house phone, the bedroom door opened and petitioner came in. He said, "I want to talk to you." He grabbed Doe's arm and said, "Come with me and this will end." At that point, Doe's stepgrandfather came up behind petitioner and pulled him out of the room. Doe could hear her stepgrandfather and petitioner fighting; she tried to go out the back door, but could not get the door open. She then saw petitioner coming toward her; he took her arm again and "said to come with him and it will all stop." Doe said, "No, I don't want to." Petitioner said, "Fine," and turned and tried to leave out the back door. He could not get out from that direction so he turned around and exited out the front door.

Meanwhile, neighbors who had heard the ruckus called the police. Doe's stepgrandfather was transported to a hospital. During the struggle with petitioner, her stepgrandfather fell to the floor and his arms were pinned between the furniture. Petitioner was on top of Doe's stepgrandfather and "pound[ed] the heck out" of him. Her stepgrandfather suffered contusions on his face and swelling on the brain, which required

6

surgery and a stay in intensive care for "four days without [him] being able to move [his] head."

We review de novo a trial court's order denying a petitioner's section 995 motion. (*People v. Jones* (1998) 17 Cal.4th 279, 301; *People v. Laiwa* (1983) 34 Cal.3d 711, 718.) "Evidence that will justify a prosecution need not be sufficient to support a conviction. [Citations.] ' "Probable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused.' [Citations.] An information will not be set aside or a prosecution thereon prohibited if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it. [Citations.] [¶] A reviewing court may not substitute its judgment as to the weight of the evidence for that of the magistrate, and, if there is some evidence to support the information, the court will not inquire into its sufficiency. [Citations.] Every legitimate inference that may be drawn from the evidence must be drawn in favor of the information." ' " (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474.)

Applying these principles here, we conclude that the evidence at the preliminary hearing sufficiently establishes a rational ground to assume the possibility petitioner committed the offenses charged in count 5 (stalking), count 6 (attempted kidnapping) and count 7 (residential burglary). As to count 5, "[t]he elements of the crime of stalking (§ 646.9) are (1) repeatedly following or harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear of death or great bodily injury. [Citation.]" (*People v. Ewing* (1999) 76 Cal.App.4th 199, 210.) Drawing every legitimate inference from the evidence in favor of the information, we conclude petitioner's course of conduct from the incident at the Holiday Inn in November 2009 through the events of March 24, 2010, at Doe's grandparents' home provides a rational ground to assume the possibility that petitioner harassed Doe and made credible threats with the intent to incite a reasonable fear of great bodily injury.

7

As to count 6, the elements of kidnapping are " '(1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance.' [Citation.]" (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.) An attempted kidnapping is established if the People demonstrate " 'a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' " (*People v. Toledo* (2001) 26 Cal.4th 221, 229.) Again, drawing every legitimate inference from the evidence in favor of the information, we conclude petitioner's conduct on March 24, 2010, when he forced his way into Doe's stepgrandfather's residence to reach her, provides some rational ground to assume the possibility that petitioner intended to kidnap Doe. And, as petitioner acknowledges, if there is sufficient evidence to go forward on the charge of attempted kidnapping, there is necessarily sufficient evidence to go forward on count 7 (residential burglary).

Having concluded that the evidence is sufficient to establish a rational ground to assume the possibility petitioner committed the offenses alleged in counts 5, 6, and 7, we summarily deny the petition as to those counts of the information by separate order filed this date.

But we reach a different outcome on count 9 (forcible rape). Even drawing every favorable inference from the evidence, we conclude the People failed to present sufficient evidence to support the charge. "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: [¶] . . . [¶] (2) Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a).) Here, the evidence shows Doe spent the evening with petitioner in the kitchen area of his family's room at the Flamingo Motel and slept with him that night. The following day Doe "hung out" with Sanchez doing what they "normally did." No evidence supports an inference Doe stayed at the Flamingo Motel with petitioner against her will. Before leaving the motel, petitioner asked Doe to have sex with him. Doe initially said she didn't feel like having sex, but she agreed to have

sex with certain caveats discussed above. Thus, there is insufficient evidence that petitioner had sex with Doe against her will.

DISPOSITION

We notified the parties that we might choose to act by issuing our peremptory writ in the first instance. (*Palma v. U.S. Industrial Fasteners, Inc., supra,* 36 Cal.3d pp. 177-180.) No useful purpose would be served by issuing an alternative writ and proceeding with oral argument.

Let a peremptory writ of prohibition issue restraining respondent from conducting any further proceedings on count 9 ("the crime of FORCIBLE RAPE, in violation of Penal Code SECTION 261(a)(2)") of the information on file in *People v. Silverio Parro Snider Sanchez* (Humboldt Co. Sup.Ct. No. 2010-00-0002984), other than dismissal pursuant to Penal Code section 995. The stay of count 9 shall remain in effect until the remittitur issues.

_____
Humes, P.J.

We concur:

_____
Dondero, J.

_____
Banke, J.

9